**SOUTHWEST SOFTWARE, INC.,**
**Plaintiff–Cross Appellant,**

v.

**HARLEQUIN INCORPORATED,**
**Harlequin Limited, and ECRM**
**Trust, Defendants–Appellants.**

**Nos. 99–1213, 99–1214.**

United States Court of Appeals,
Federal Circuit.

Sept. 18, 2000

David D. Bahler, Arnold, White & Durkee, of Austin, Texas, argued for plaintiff-cross appellant. With him on the brief were Amber L. Hatfield and G. Scott Thomas. Of counsel on the brief were Scott R. Kidd, Raymond L. Sturm, and Walter H. Mizell, Brown McCarroll & Oaks Hartline, of Austin, Texas.

Thomas H. Watkins, Hilgers & Watkins, P.C., of Austin, Texas, argued for defendants-appellants. With him on the brief was Albert A. Carrion, Jr. Of counsel on the brief were John J. Regan, Hale and Dorr LLP, of Boston, Massachusetts, and Michael P. Adams, Skjerven, Morrill, MacPherson, Franklin & Friel, L.L.P., of Austin, Texas.

Before MICHEL, Circuit Judge, SKELTON, Senior Circuit Judge, and SCHALL, Circuit Judge.

SCHALL, Circuit Judge.

Harlequin Incorporated and Harlequin Limited (collectively "Harlequin") and ECRM Trust ("ECRM") appeal from the judgment of patent infringement entered against them in the United States District Court for the Western District of Texas. The judgment was entered upon a jury verdict. The jury found that: (1) claim 1 of Southwest Software, Inc.'s ("Southwest's") reexamined U.S. Patent No. B1 5,170,257 (the " '257 patent") is not invalid; (2) claim 1 of the '257 patent was directly infringed by Harlequin and ECRM, both literally and under the doctrine of equivalents; and (3) Harlequin and ECRM had induced infringement of claim 1, had contributorily infringed claim 1, and also had infringed claim 1 by supplying or causing to be supplied components of a patented combination outside the United States, in violation of 35 U.S.C. § 271(f).[1] *See*

---

1. Unless otherwise indicated, all statutory references are to the 1994 version of the United States Code.

*Southwest Software, Inc. v. Harlequin, Inc.*, No. A 95-CA-032 SS (W.D.Tex. Sept. 30, 1998).

The '257 patent is directed to a method and apparatus used in the printing industry to enhance the quality of printed images. The jury found that claim 1 of the '257 patent was infringed by ScriptWorks Version 3.3–Revision 6 ("ScriptWorks Revision 6"), a Harlequin software product, and awarded damages based upon that infringement. *See id.* The jury, however, did not find infringement of claim 1 of the '257 patent by ScriptWorks Version 3.3–Revision 7 ("ScriptWorks Revision 7"), another Harlequin software product. *See id.* The district court denied Harlequin's and ECRM's motion for judgment as a matter of law ("JMOL") that they did not infringe claim 1 of the '257 patent and that claim 1 is invalid.

Southwest cross-appeals from the judgment that claim 1 of the '257 patent was not infringed by ScriptWorks Revision 7. In so doing, it challenges the jury's verdict of noninfringement and the district court's denial of a new trial on the infringement issue. Southwest also cross-appeals the district court's grant of Harlequin's and ECRM's motion for JMOL that claim 11 of the '257 patent and claim 10 of Southwest's U.S. Patent No. 5,245,443 (the " '443 patent") were not infringed by either ScriptWorks Revision 6 or 7. The '443 patent is a continuation of the '257 patent.

The judgment of the district court is vacated and the case is remanded for further proceedings. As far as Harlequin's and ECRM's appeal is concerned, we see no error in the district court's denial of Harlequin's and ECRM's motion for JMOL on the issue of infringement of claim 1 of the '257 patent by ScriptWorks Revision 6. We conclude that the denial of JMOL on the issue of the validity of claim 1 of the '257 patent was erroneous, however. Specifically, because we hold that a certificate of correction that was issued under 35 U.S.C. § 254 to add certain material to the '257 patent is not effective for purposes of this action, the district court must determine on remand whether, absent the added material, claim 1 of the '257 patent is invalid for purposes of this action because the patent's specification fails to satisfy the best mode and enablement requirements of 35 U.S.C. § 112, ¶ 1.

As far as Southwest's cross-appeal is concerned, we see no error in the district court's denial of a new trial on the issue of infringement of claim 1 of the '257 patent by ScriptWorks Revision 7. However, because the district court failed to construe the relevant claim limitation, we vacate the court's grant of Harlequin's and ECRM's motion for JMOL that claim 11 of the '257 patent and claim 10 of the '443 patent were not infringed by ScriptWorks Revision 6 or 7 and remand for further proceedings on those issues.

## BACKGROUND

### I. The Technology Involved

The technology at issue in this case is designed to enhance the quality of printed images. Its primary use is in the printing industry.

Today, computer "desktop publishing" programs allow a user to create an image on a computer screen that represents the image that eventually will be printed. After the image is created on the computer screen, it is sent from the computer to an imagesetter for printing.

The imagesetter receives commands and data from the computer and then produces what is called an "output image" on film or paper. The output image typically is used to make contact printing plates. One desirable feature of an imagesetter is the ability to provide tone reproduction in which the shades of the printed image are the same as the shades called for by the data sent from the computer.

Conventional printing processes cannot reproduce continuous tone tints or images ("contones"). Instead, the process of "halftoning" is used to create the variety of ink shades necessary to print images. In the halftone process, shades of gray are

approximated by applying variously sized ink dots of black ink within the area which is to be shaded. This creates an optical illusion in which the area appears as a continuous shade of gray. Small dots render light shades, while large dots render dark shades. "Dot percentage" is the percentage of the paper or film that is blackened by the ink dots. Dot percentage ranges from 0% marking (i.e., white) to 100% marking (i.e., black). Each shade of gray is denoted by a "gray value."

"Calibration" is used to adjust the imagesetter's output so that the gray values requested from a computer application program (for example, desktop publishing software) are the same as those actually produced as output (for example, on film). Without calibration, the imagesetter tends to produce a darker shade of gray than desired—although both 0% and 100% dot areas are always achievable without calibration. For example, if the application program requests a gray value of 48%, the imagesetter might actually produce a gray value of 50%. Therefore, in order to produce a gray value of 50%, the imagesetter must be requested to produce a gray value of 48%.

Calibration involves taking the requested gray values from the computer application program and processing the values by way of a "look-up table" to produce adjusted data. The input to the look-up table is the desired gray shade; the output of the look-up table is the actual value that must be applied to the imagesetter to achieve the desired shade. In the example above, the input to the look-up table would be the desired gray value of 50%, and the output of the look-up table would be the actual value to be supplied to the imagesetter, or 48%. The adjusted data from the look-up table is used by the imagesetter to produce the desired gray shade in the output (for example, on film).

Before it can be used, the look-up table must be created. Part of the calibration process involves finding the correct numbers, or values, to put into the look-up table. The numbers in the look-up table are the "calibration set." To create the calibration set used to perform the calibration process, a test image consisting of several patches of various shades of gray is fed into the system. An output image is then made with no calibration. Next, the uncalibrated gray values that were printed are measured with a tool called a "densitometer." Based on these measurements, a calibration set is calculated using the differences between the desired gray values and the actual gray values printed without calibration. The calibration set then is used to fill in the values in the look-up table.

Thereafter, the look-up table will produce the shades of gray that correspond to the desired shades of gray provided by the input computer data. A separate calibration set is needed for each possible combination of printing parameters—such as image resolution, intensity, and screen frequency. Therefore, a large number of calibration sets may be needed for each imagesetter in order to account for all of the combinations of printing parameters that may be used.

## II. The Patents at Issue

### The '257 patent

The '257 patent is directed to a method and apparatus for calibrating halftone output images. It "programmably selects" a specific calibration set depending on imagesetter variables such as image resolution, exposure intensity, and screen frequency. The application for the '257 patent was filed on October 2, 1990; the patent issued on December 8, 1992.

Under the invention, halftone test pattern images first are created in a page description language, such as "Post-Script."[2] See '257 patent, col. 8, 1. 67 to

---

2. Page description language is a computer language representation of the desired image that indicates where dots should be placed on the page. Postscript is the dominant page description language in the industry.

col. 9, l. 1. The page description language then is sent to an imagesetter, which consists of a raster image processor[3] and a recorder. *See id.* at col. 9, ll. 1–4. The raster image processor converts the page description language into a raster format, which is then sent to the recorder. *See id.* at col. 9, ll. 3–4. Based upon the raster format provided by the raster image processor, the recorder produces the halftone input image on a selected medium and delivers the medium to a photoprocessor for chemical processing and development. *See id.* at col. 9, ll. 5–7. Output from the photoprocessor is in the form of uncalibrated test pattern images. *See id.* at col. 9, ll. 65–68.

The operator then measures the gray scales of the uncalibrated test pattern images with a standard dot-area densitometer. *See id.* at col. 10, ll. 10–13. The record of these gray scale measurements constitutes a calibration set. *See id.* at col. 10, ll. 13–16. The calibration set is stored in the raster image processor where it is used with a transfer function to adjust the imagesetter's halftone response to input data. Multiple calibration sets may be created. *See id.* at col. 10, ll. 16–17.

Once calibration sets are obtained, subsequent halftone input images are calibrated by the imagesetter in accordance with an appropriate calibration set and transfer function. *See id.* at col. 10, ll. 25–28. Thus, for subsequent halftone input images, a selector in the raster image processor selects a calibration set that is appropriate given the current system conditions such as, for example, exposure intensity, media, resolution, screen frequency, etc. *See id.* at col. 10, ll. 28–34.

The '257 patent was the subject of a reexamination proceeding. The reexamined '257 patent was issued on February 7, 1995. Claim 1, as modified in the reexamination, recites:

3. The raster image processor converts the page description language from an application program (for example, desktop publish-

1. A method of calibrating halftone output images form [sic] an imagesetting device, comprising:

providing a halftone input image, each said input image including a plurality of requested gray value densities, each said input image being a function of image resolution, exposure intensity and screen frequency;

reproducing said halftone images onto a photographic media;

chemically processing said media to manifest the exposure thereon;

measuring the density of each said requested gray value of each said halftone input image by a densitometer;

generating a plurality of calibration sets in accordance with said measuring step, each said calibration set corresponding to any variation between said requested gray value density and said respective measured density reading for each said half-tone input image at various said image resolutions, said exposure intensity and said screen frequency; and,

converting *a* subsequent plurality of halftone input images to a respective plurality of calibrated halftone output images according to changes made to said subsequent halftone input images by said calibration sets, *by programmably selecting a particular calibration set of said plurality of calibration sets to be used to convert one of said subsequent plurality of halftone input images depending upon said imagesetting device current settings of said image resolution, said exposure intensity and said screen frequency.*

(additions made during reexamination in italics).

The patentability of claim 11 of the '257 patent was confirmed in the reexamination. Claim 11 recites:

ing software) to a "raster." A raster is a grid of lines, and is made up of individual "pixel" dots, which can be either on or off.

11. An apparatus for generating calibrated halftone output images from an imagesetting device, comprising:

a halftone input image including a plurality of gray values, each said gray value having a requested density value;

means for converting said input image into a page description language;

a raster image processor having a channel for receiving said page description language and converting said language into a raster representation of said halftone input image;

a recorder connected to said raster image processor, said recorder includes a modulated light source to expose said raster representation onto a photographic media;

a photoprocessor configured to receive said photographic media for chemically developing said media;

a densitometer for measuring amount of density of each said gray value of said developed photographic medium;

a computer for receiving a plurality of programmed calibration sets, said sets include variations between measured density of said densitometer and corresponding said requested density;

a subsequent uncalibrated halftone input image, said subsequent halftone input image converted into said page description language and inputted to said computer;

a selector accessed by said computer for receiving said subsequent halftone input images and selecting a corresponding said calibration set stored in said computer to programmably adjust said uncalibrated halftone input image to said calibrated output halftone image; and,

mapping means for mapping either positive or negative sense representations of said subsequent uncalibrated halftone input images through said raster image processor, said recorder, said photoprocessor and outputted as calibrated said halftone output images on said photographic media.

*The '443 patent*

The '443 patent is a continuation of the '257 patent. The application for the '443 patent was filed on July 7, 1992; the patent issued on September 14, 1993.

Claim 10 of the '443 patent recites:

10. An apparatus for generating calibrated output images from a[sic] image generating device, comprising:

a means for converting an input image into a page description language, said input image including a plurality of image density values, each said image density value having a requested density value;

an image processor having a channel for receiving said page description language and converting said language into a representation of said input image;

a recorder connected to said image processor, for recording said representation onto image bearing media;

a densitometer for measuring a density of each said image density value of said recorded image;

a computer for receiving a plurality of programmed calibration sets, said sets including variations between density measured by said densitometer and corresponding requested density;

a selector accessed by said computer for receiving subsequent uncalibrated input images represented in said page description language, and for selecting a corresponding said calibration set stored in said computer to programmably adjust said uncalibrated input image to said calibrated output image; and

mapping means for mapping either positive or negative sense representations of said subsequent uncalibrated input images through said image processor, and said recorder, to be output as said calibrated output images on said image bearing media.

### III. Southwest's Lawsuit Against Harlequin and ECRM

*The parties and the accused products*

Southwest is the owner of the '257 and '443 patents. Harlequin Incorporated and Harlequin Limited are companies owned by the Harlequin Group, an English software company. (As noted above, we refer to these two parties collectively as "Harlequin.") Harlequin developed ScriptWorks Revision 6, a raster image processor software product with a built-in calibration feature, as part of its Script-Works family of raster image processor software products. The main function of ScriptWorks Revision 6 is to convert computer code describing an image to be printed from an initial representation to a "raster" representation that can be applied directly to a printing mechanism. Script-Works Revision 6 also performs calibration. ECRM is a Delaware corporation. It manufactures imagesetters and is a customer of Harlequin. In particular, ECRM makes and sells an imagesetter known as the "Scriptsetter," which includes Harlequin's software raster image processor.

On January 20, 1995, Southwest sued Harlequin and ECRM for infringement of claims 1, 7, and 11 of the '257 patent and claims 6, 10, and 11 of the '443 patent by Harlequin's ScriptWorks Revision 6.[4] After the suit was filed, Harlequin took action to "defeature" the automatic selection of calibration set feature of its accused product. The "defeatured" product was Script-Works Revision 7. With this "defeaturing," users of Harlequin's raster image processor could no longer activate the automatic calibration feature. Instead, they were required to manually select a calibration set from a computer menu.

The automatic selection source code used in ScriptWorks Revision 6 was not removed from ScriptWorks Revision 7. Instead, using a common industry practice, the source code was modified so that the automatic selection feature could not be invoked during normal operation of the software. However, ScriptWorks Revision 7 does contain a "warn system." This "warn system" alerts an operator when the manually selected calibration set is inappropriate for the job, but it does not suggest or select a better calibration set. The operator must manually select the calibration set.

*Proceedings in the district court*

In August of 1996, Harlequin noted that there was missing from the certified copy of the '257 patent a "Program Printout Appendix" containing PostScript code for the calibration feature of the invention.[5] Shortly thereafter, Harlequin and ECRM filed a motion for summary judgment, in which they argued that, in view of the omission of the Program Printout Appendix, claims 1 and 11 of the '257 patent were invalid because the '257 patent's specification failed to meet the best mode and enablement requirements of 35 U.S.C. § 112, ¶ 1. They further argued that claims 1 and 11 of the '257 patent and claim 10 of the '443 patent were invalid due to anticipation and obviousness under 35 U.S.C. §§ 102 and 103.

Southwest promptly requested that the Patent and Trademark Office ("PTO") issue a certificate of correction for the '257 patent under 35 U.S.C. § 254. In due course, the PTO issued a certificate of correction adding the Program Printout Appendix to the '257 patent.[6]

Harlequin and ECRM next moved for summary judgment that the certificate of correction was invalid and that, without the Program Printout Appendix as part of

---

4. Prior to trial, Southwest decided to pursue its action only with respect to claims 1 and 11 of the '257 patent and claim 10 of the '443 patent.

5. The certified copy of the '443 patent has at all times included the Program Printout Appendix.

6. This was the second certificate of correction that was issued with respect to the '257 patent. A previous certificate of correction had been issued to correct the error of a missing comma.

the '257 patent, claims 1 and 11 were invalid, again, by reason of the specification's failure to satisfy the enablement and best mode requirements of 35 U.S.C. § 112, ¶ 1. Alternatively, they argued that, even if the certificate of correction was validly issued, it is not effective in this suit. Finally, Harlequin and ECRM asserted, as they had before, that apart from the matter of the certificate of correction, claims 1 and 11 of the '257 patent and claim 10 of the '443 patent were invalid because prior art either anticipated them under 35 U.S.C. § 102 or rendered them obvious under 35 U.S.C. § 103. On June 19, 1998, the district court denied Harlequin's and ECRM's motion without prejudice to their refiling it as a motion for JMOL at trial.

On August 17, 1998, a jury trial was held. In addition to denying infringement of claims 1 and 11 of the '257 patent, Harlequin and ECRM asserted that claims 1 and 11 were invalid due to anticipation, obviousness, lack of enablement, lack of definiteness, lack of an adequate written description, failure to disclose the best mode of practicing the invention, and lack of utility. However, Harlequin's and ECRM's arguments with respect to enablement and best mode as related to the certificate of correction issue were not presented to the jury. Harlequin and ECRM also denied infringement of claim 10 of the '443 patent. At the close of the evidence, Harlequin and ECRM moved for JMOL, but only on the issue of infringement. In particular, they contended that they did not infringe any of the asserted claims directly; they also contended that they did not induce infringement of, or contributorily infringe, any of the claims. However, they did not move for JMOL that they did not infringe claim 1 of the '257 patent under 35 U.S.C. § 271(f) by supplying or causing to be supplied components of a patented combination outside the United States. Before submitting the case to the jury, the district court granted the motion for JMOL of noninfringement as to claim 11 of the '257 patent and claim 10 of the '443 patent. Thus, the only issues submitted to the jury were infringe-

ment of claim 1 of the '257 patent and the validity of claim 1.

On August 28, 1998, the jury returned its verdict. As noted above, the jury found that Harlequin and ECRM had directly infringed claim 1 of the '257 patent, both literally and under the doctrine of equivalents. The jury also found that Harlequin and ECRM had induced infringement of claim 1, had contributorily infringed claim 1, and had infringed claim 1 under 35 U.S.C. § 271(f) because they had supplied or caused to be supplied components of a patented invention outside the United States. The device based upon which Harlequin and ECRM were found to have infringed was Harlequin's ScriptWorks Revision 6. No infringement was found by reason of ScriptWorks Revision 7. Further, the jury found claim 1 of the '257 patent to be not invalid by reason of anticipation, obviousness, lack of enablement, lack of definiteness, lack of an adequate written description, failure to disclose best mode, or lack of utility. The jury awarded damages to Southwest for infringement of claim 1 by Harlequin in the amount of $459,412 and by ECRM in the amount of $93,112.

Harlequin and ECRM made a post-verdict motion for JMOL on the issues of both validity and infringement. After the motion was denied, they moved for a new trial on the issue of the validity of claim 1 of the '257 patent. In their motion, Harlequin and ECRM contended that the evidence at trial established as a matter of law that claim 1 was invalid for obviousness, lack of enablement, lack of definiteness, lack of an adequate written description, failure to disclose best mode, and lack of utility. Alternatively, they contended that the jury's verdict was against the great weight of the evidence on the validity issues. Harlequin and ECRM also renewed their arguments with respect to the certificate of correction that they had raised in their motion for summary judgment before trial. For its part, Southwest moved for a new trial on the issues of

infringement of claim 1 of the '257 patent by Harlequin's ScriptWorks Revision 7 and the amount of the jury's damages award. The district court denied all of these post-trial motions.

## DISCUSSION

### I. Introduction

In this section of the opinion we set forth the contentions of the parties and address those contentions that require only limited discussion.

*Contentions of the parties*

On appeal, Harlequin and ECRM challenge the jury's verdict of infringement of claim 1 of the '257 patent by Harlequin's ScriptWorks Revision 6; they also renew the argument made in their post-verdict motion for JMOL that claim 1 of the '257 patent is invalid. In that regard, they argue that the certificate of correction adding the Program Printout Appendix to the '257 patent is defective because it was issued in violation of 35 U.S.C. § 254. Thus, they contend that the Program Printout·Appendix is not part of the '257 patent and that, as a consequence, the patent violates the best mode and enablement requirements of 35 U.S.C. § 112, ¶ 1. Alternatively, they argue that the certificate of correction is not effective for purposes of this suit. Harlequin and ECRM additionally contend that, in any event, claim 1 of the '257 patent is invalid for obviousness under 35 U.S.C. § 103. They also contend that claim 1 is invalid because the '257 patent does not teach how to calibrate halftone input images and, therefore, it fails to meet the enablement, best mode, and written description require-

ments of 35 U.S.C. § 112, ¶ 1, the definiteness requirement of 35 U.S.C. § 112, ¶ 2, and the utility requirement of 35 U.S.C. § 101. Harlequin and ECRM do not appeal the jury's verdict that the '257 patent is not anticipated.[7]

On cross-appeal, Southwest challenges the jury verdict of noninfringement of claim 1 of the '257 patent by ScriptWorks Revision 7, as well as the district court's denial of a new trial on the issue. Southwest also challenges the district court's grant of JMOL of noninfringement of claim 11 of the '257 patent and claim 10 of the '443 patent by Harlequin's Script-Works Revisions 6 and 7.

*Harlequin's and ECRM's arguments relating to infringement of the '257 patent*

We review the district court's ruling on a motion for JMOL by reapplying the JMOL standard. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 975, 34 USPQ2d 1321, 1326 (Fed.Cir.1995) (en banc), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996); *Harrington v. Harris*, 118 F.3d 359, 367 (5th Cir.1997). We determine whether, "viewing the evidence in the light most favorable to the non-moving party," and giving the non-movant "the benefit of all reasonable inferences," there is sufficient evidence of record to support a jury verdict in favor of the non-movant. *Allied Colloids Inc. v. American Cyanamid Co.*, 64 F.3d 1570, 1573, 35 USPQ2d 1840, 1841 (Fed.Cir. 1995); *see Harrington*, 118 F.3d at 367. In reviewing the propriety of the grant of JMOL we do not weigh the evidence, consider the credibility of witnesses, or decide

7. Harlequin and ECRM assert in passing that the '443 patent is invalid due to an on-sale bar under 35 U.S.C. § 102(b) as a direct consequence of the '257 patent's defective or ineffective certificate of correction. Without the certificate of correction, they argue, the '257 patent is invalid due to failure to comply with the best mode and enablement requirements of 35 U.S.C. § 112, ¶ 1. Therefore, they, argue, the '443 patent should not be entitled to the benefit of the filing date of the '257 patent. According to Harlequin and ECRM, Southwest admitted to selling a software cali-

bration product covered by the '257 and '443 patents more than one year before the filing date of the '443 patent. Having reviewed the record, however, we conclude that Harlequin and ECRM failed to adequately raise this issue before the district court. We therefore consider it waived. *See Finch v. Hughes Aircraft Co.*, 926 F.2d 1574, 1577, 17 USPQ2d 1914, 1916 (Fed.Cir.1991) ("[A]bsent exceptional circumstances, a party cannot raise on appeal legal issues not raised and considered in the trial forum.").

disputed facts. *See Allied Colloids*, 64 F.3d at 1573, 35 USPQ2d at 1841; *Harrington*, 118 F.3d at 367. Instead, the test we apply is whether "there can be but one conclusion as to the verdict that reasonable jurors could have reached." *Allied Colloids*, 64 F.3d at 1573, 35 USPQ2d at 1841 (citations and quotations omitted); *see Harrington*, 118 F.3d at 367.

We have carefully considered all of the issues relating to infringement raised by Harlequin and ECRM. Having done so, we discern no error in the district court's denial of Harlequin's and ECRM's JMOL motion on the issues of direct infringement of claim 1 of the '257 patent and contributory infringement and inducement of infringement of claim 1 by ScriptWorks Revision 6.

The jury also found infringement on the part of Harlequin and ECRM for supplying or causing to be supplied components of a patented combination outside the United States, in violation of 35 U.S.C. § 271(f). Harlequin and ECRM argue that they cannot be liable as a matter of law for infringement under § 271(f) because there was not substantial evidence of a third party outside the United States actually combining components supplied by them in a manner that would infringe claim 1 of the '257 patent. They also argue that § 271(f) only covers apparatus claims, and, because claim 1 is a method claim, § 271(f) does not apply. Southwest argues that Harlequin and ECRM waived their § 271(f) argument because they did not move for JMOL of noninfringement under § 271(f) at trial and did not challenge submission of the issue to the jury.

 Infringement is a question of fact. *See Optical Disc Corp. v. Del Mar Avionics*, 208 F.3d 1324, 1333–34, 54 USPQ2d 1289, 1294–95 (Fed.Cir.2000). Failing to properly move for JMOL at the close of the evidence precludes a challenge to the sufficiency of the evidence underlying fact findings. *See Young Dental Mfg. Co. v. Q3 Special Prods., Inc.*, 112 F.3d 1137, 1141, 42 USPQ2d 1589, 1592 (Fed. Cir.1997). Here, Harlequin and ECRM

did not properly move for JMOL concerning infringement under § 271(f). This means that they may not challenge the sufficiency of the evidence on this issue. Moreover, Harlequin's and ECRM's argument concerning the application of § 271 to method claims was raised for the first time on appeal; for that reason, we will not consider it. *See Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1426, 44 USPQ2d 1103, 1108 (Fed.Cir.1997).

Based upon the foregoing, we will not disturb the district court's denial of Harlequin's and ECRM's motion for JMOL with respect to the issue of infringement of claim 1 of the '257 patent. We address in Part II below the issue of the validity of claim 1 of the '257 patent.

*Southwest's challenge to the denial of its request for a new trial*

 Turning to Southwest's cross-appeal, we note that the denial of a motion for a new trial is a procedural issue not unique to patent law. Therefore, we apply the law of the regional circuit where the appeal from the district court normally would lie—in this case, the Fifth Circuit. *See WMS Gaming, Inc. v. International Game Tech.*, 184 F.3d 1339, 1361, 51 USPQ2d 1385, 1401 (Fed.Cir.1999). In the Fifth Circuit, "[t]he decision to grant or deny a motion for a new trial is within the discretion of the trial court and will not be disturbed absent an abuse of discretion or a misapprehension of the law." *Prytania Park Hotel, Ltd. v. General Star Indem. Co.*, 179 F.3d 169, 173 (5th Cir.1999) (citing *Mitchell v. Lone Star Ammunition, Inc.*, 913 F.2d 242, 252 (5th Cir.1990)). The denial of a motion for new trial will be affirmed "unless, on appeal, the party that was the movant in district court makes a clear showing of an absolute absence of evidence to support the jury's verdict, thus indicating that the trial court ... abused its discretion in refusing to find the jury's verdict contrary to the great weight of the evidence." *Rutherford v. Harris County*, 197 F.3d 173, 179 (5th Cir.1999) (citations and quotations omitted). "[R]eview of the

denial of a new trial motion is more limited than when one is granted." *Id.* (citations and quotations omitted).

■ Southwest argues that the district court erred by failing to grant its motion for a new trial on the issue of infringement of claim 1 of the '257 patent by Script-Works Revision 7. Southwest argues that the jury's verdict was against the great weight of the evidence because the same computer code found in ScriptWorks Revision 6 is still contained in ScriptWorks Revision 7. In response, Harlequin argues that the jury's verdict is supported by substantial evidence and that the district court did not abuse its discretion in denying the motion.

Southwest has not met its burden on this issue. There was substantial evidence to support the jury's verdict. Specifically, there was evidence indicating that Script-Works Revision 7 included a manual step which avoided the automatic selection feature of the patented invention even though the code for automatic selection remained in place. The district court did not abuse its discretion in refusing to grant a new trial. We address in Part III below Southwest's challenge to the district court's judgment of noninfringement of claim 11 of the '257 patent and claim 10 of the '443 patent.

## II. Harlequin's and ECRM's Appeal

*Validity*

■ 1. Harlequin's and ECRM's main argument relating to the validity of claim 1 of the '257 patent grows out of the issuance of the second certificate of correction. As noted above, the second certificate of correction was issued to correct the omission of the Program Printout Appendix from the '257 patent.

The "BACKGROUND OF THE INVENTION" section of the '257 patent states that:

Incorporated herein is a computer program listing printout appendix of source code used to generate calibration sets and calibration transfer functions of a test pattern to enable calibration of halftone output images according to the present invention. Copyright, 1990, Softwest [sic] Software Inc. A portion of the disclosure of this patent document contains material which is subject to copyright protection. The copyright owner has no objection to the facsimile reproduction by anyone of the "Program Printout Appendix", as it appears in the Patent and Trademark Office Patent file or records, but otherwise reserves all copyright rights whatsoever.

'257 patent, col. 1, ll. 8–19.

When it was discovered that the certified copy of the '257 patent was missing the Program Printout Appendix, which contained PostScript code for the calibration feature, Southwest requested that the PTO issue a certificate of correction under 35 U.S.C. § 254 to add the appendix. Southwest stated that the omission was due to a printing mistake by the PTO. It also stated that the error was disclosed in the records of the PTO, and it presented affidavits and Express Mail mailing receipts in support of its claim. As noted above, the PTO granted the request and issued a certificate of correction adding the Program Printout Appendix to the patent. The PTO determined that the appendix had been filed with the application for the '257 patent and that the separation and loss of the appendix, as well as the failure to print the appendix in the issued patent, were the result of an error on its part. The PTO effected the correction by doing two things. First, it added the following sentence at the end of the paragraph quoted above: "A complete copy of the Program Printout Appendix is included." Second, it inserted the Appendix after line 63 in column 13 of the patent, immediately before the recitation of the claims. This is the same place at which the Program Printout Appendix appears in the '443 patent.

As in effect during this litigation, 35 U.S.C. § 254, entitled "Certificate of correction of Patent and Trademark Office mistake," provided as follows:

Whenever a mistake in a patent, incurred through the fault of the Patent and Trademark Office, is clearly disclosed by the records of the Office, the Commissioner may issue a certificate of correction stating the fact and nature of such mistake, under seal, without charge, to be recorded in the records of patents. A printed copy thereof shall be attached to each printed copy of the patent, and such certificate shall be considered as part of the original patent. Every such patent, together with such certificate, shall have the same effect and operation in law on the trial of actions for causes thereafter arising as if the same had been originally issued in such corrected form. The Commissioner may issue a corrected patent without charge in lieu of and with like effect as a certificate of correction.[8]

Harlequin and ECRM argue that the certificate of correction is invalid because it was issued in violation of 35 U.S.C. § 254. Specifically, they assert that the omission of the Program Printout Appendix from the '257 patent was not "the fault of the [PTO]" and was not "clearly disclosed by the records of the [PTO]" as required by the statute. According to Harlequin and ECRM, the PTO's decision to issue the certificate of correction was improperly based on extrinsic evidence that Southwest submitted in support of its request, and the PTO's records alone do not clearly disclose a mistake by the PTO. Further, they argue that the extrinsic evidence of record actually shows that the omission of the Program Printout Appendix was the fault of Southwest and not the PTO. As a result, Harlequin and ECRM urge that the certificate of correction should be declared invalid as a matter of law. If the certificate of correction is invalid and the Program Printout Appendix is not part of the patent, Harlequin and ECRM argue, claim 1 of the '257 patent is invalid because the specification fails to satisfy the best mode and enablement requirements of 35 U.S.C. § 112, ¶ 1. Southwest responds that Harlequin and ECRM never properly raised before the jury or the district court the underlying factual issues relating to the issuance of the certificate of correction and that, in any event, the certificate of correction's issuance was supported by the PTO's internal records and the PTO properly considered extrinsic evidence in deciding to issue the certificate.

■ Southwest is correct that no evidence was presented to the jury on the issue of whether the PTO properly issued the certificate of correction. Neither did Harlequin and ECRM move for JMOL on the issue at the close of the evidence. Rather, they raised the issue in a post-verdict motion for JMOL. We believe, however, that the issue was properly preserved for consideration by the district court after the jury verdict. In paragraph three of a pre-trial motion in limine, Southwest sought to exclude the introduction of "[a]ny reference to, comment concerning, or evidence pertaining to defendants' allegations of inequitable conduct and unclean hands in front of the jury.... Accordingly, any factual issues related to those claimed defenses concerning the '257 Certificate of Correction should be heard and determined solely by the Court."

At a motions hearing before trial, the parties and the district court appeared to agree that all fact issues relating to the certificate of correction would be reserved until after trial. The following exchange took place:

MR. WATKINS [counsel for Harlequin]:

\* \* \* \* \* \*

I don't have any objection to carving that little piece—is the certificate of correction valid and is there any inequitable conduct relating to the obtaining of the certificate of correction—and putting it

---

**8.** The only difference between the statute then in effect and the statute in its present form is that "Commissioner" has been replaced with "Director" throughout the statute. *See* 35 U.S.C.A. § 254 (West Supp.2000).

off until after we get through with this trial.

\* \* \* \* \* \*

Now, we—we have to decide what we're going to do with the certificate of correction during the trial of this cause. And my suggestion to the court and to counsel is that it's there, it's part of the patent, we just try it and we don't fight about if it's any good or not, and we just preserve that until we get past of [sic] the end of this trial. Because I think that's the only way we can get to the jury on this. We will have an argument post-verdict about the retroactive effect of any rights that they claim under the certificate of correction, and I just think all of that can wait until then.

\* \* \* \* \* \*

But for purposes of our trial, Judge, I really think—and I need to have Scott [Kidd, counsel for Southwest] respond to this—that we just hold all that off, you grant his motion in limine that we can't complain about inequitable conduct as it relates to the certificate of correction, and we try the case as though the certificate of correction is part of the patent, which it is, and then see if we ever really get to that.

MR. KIDD [counsel for Southwest]:

Yes, sir. I think we can do that. I hadn't particularly planned on it being postponed any period of time, other than perhaps one afternoon during the trial of this case. But specifically, that Paragraph 3 [of the motion in limine] was relating specifically to the certificate of correction. And I wasn't talking about the original issue of the '257. So I think we can do that.

THE COURT:

All right. Well, I'll grant ... [paragraph] 3 [of the motion in limine] as not contested.... I'm not so sure that this issue isn't going to be a lot more important at some date because—well, it shouldn't be but it is, and who—who sustains the detriment of his, her, its or their or thems [sic] conduct, I don't know, but it's very difficult to apply all of these concepts in the patent law when you have got a factual matter as screwed up as this one is.

Based upon this colloquy, we conclude that the parties agreed, and the district court ruled, that no evidence would be presented or argument made to the jury with respect to the issues surrounding the certificate of correction. Instead, after trial, Harlequin and ECRM would raise these issues, including the issue of the effectiveness of the certificate of correction in this action. Thus, as far as all validity issues were concerned, the case was to be tried as if the Program Printout Appendix was part of the '257 patent.

At a post-verdict hearing, the district court stated that it considered issues surrounding the certificate of correction to be properly preserved for decision. As far as the merits were concerned, the court determined that the Program Printout Appendix had been misplaced or lost by the PTO and that, therefore, the omission of the appendix from the '257 patent was the fault of the PTO. We discern no clear error in the district court's findings and therefore affirm the ruling that the certificate of correction was not issued in violation of § 254. The court, however, did not address the issue of the effective date of the certificate of correction or the consequences if the certificate is not effective for purposes of this suit.

■ 2. In what appears to be an issue of first impression, Harlequin and ECRM renew their alternative argument that, even if the certificate of correction was validly issued, it should not be given any effect in the instant lawsuit. Specifically, they contend that, under the express language of 35 U.S.C. § 254, a certificate of correction is only effective for causes of action arising after it is issued. According to Harlequin and ECRM, because Southwest filed its lawsuit on January 20, 1995, and the certificate of correction was not issued until April 1, 1997, the certificate has no effect in this case and the Program Printout Appendix cannot be considered

part of the '257 patent. Without the Program Printout Appendix, they assert, the '257 patent violates the best mode and enablement requirements of 35 U.S.C. § 112, ¶ 1. Consequently, claim 1 of the patent is deemed invalid, at least for purposes of this suit.

Southwest responds that the certificate of correction should be treated as if it were effective on the day the '257 patent issued. It contends that the language in 35 U.S.C. § 254 that "such certificate shall be considered as part of the original patent" would be nullified and rendered mere surplusage if the certificate of correction only were to apply prospectively from its issue date. In other words, according to Southwest, the certificate of correction could not be considered "as part of the original patent" if it was only effective as of the date it issued. Southwest urges that the only way to harmonize all parts of § 254 is to interpret the statute to require that "[e]very such patent" relate to "the original patent" so that the "causes thereafter arising" language in the statute refers to causes arising after the date of the original patent.

We begin the process of statutory interpretation with the language of the statute. *See Van Wersch v. Department of Health & Human Servs.*, 197 F.3d 1144, 1148 (Fed.Cir.1999) (citing *VE Holding Corp. v. Johnson Gas Appliance Co.*, 917 F.2d 1574, 1579, 16 USPQ2d 1614, 1618 (Fed.Cir.1990)). If the language is clear, the plain meaning is conclusive. *See id.* at 1152 (holding that Congressional intent, as clearly expressed in legislative history, could not "trump the irrefutably plain [statutory] language that emerged when Congress actually took pen to paper").[9]

Southwest's cause of action against Harlequin and ECRM arose before the certificate of correction was issued. We hold that the certificate of correction that added the Program Printout Appendix is not to be given effect in this pre-certificate lawsuit. The certificate of correction is only effective for causes of action arising after it was issued. This interpretation of § 254 is based upon the language of the statute.

Section 254 provides that "[a] printed copy [of the certificate of correc-

---

9. Neither party cites to the legislative history of 35 U.S.C. § 254. This is understandable, as it sheds little light on the issue before us. Section 254 was originally enacted by the Patent Act of 1925. *See* Patent Act of Mar. 4, 1925, ch. 535, 43 Stat. 1268 (1925) (current version at 35 U.S.C. § 254 (Supp.2000)). Its purpose was "to save time and money and also promote efficiency in the operation of the Patent Office" because, when errors are detected that "are clearly clerical errors . . . [the Patent Office will] append a certificate of correction to the patent to show that the error was a typographical error, and the certificate explains this, and the certificate obviates the necessity of reprinting the entire patent." 65 Cong. Rec. 6,842–43 (1924) (statement of Rep. Lanham). The statute "saves expense. It saves the reprinting of patents and allows the offering of these amended patents, with these certificates in them, in evidence rather than requiring a reprint of the entire patent." *Id.* at 6,843. The 1925 version of the statute provided as follows:

That whenever a mistake in a patent or trade-mark registration, incurred through the fault of the Patent Office, is clearly

disclosed by the records or files of the office, a certificate, stating the fact and nature of such mistake, signed by the Commissioner of Patents and sealed with the seal of the Patent Office, may be issued, without charge, and recorded in the records of patents or trade-marks, and a printed copy thereof attached to each printed copy of the patent or trade-mark registration, and such certificate shall thereafter be considered as part of the original, and every patent or trade-mark registration, together with such certificate, shall have the same effect and operation in law on the trial of all actions for causes thereafter arising as if the same had been originally issued in such corrected form. All such certificates heretofore issued in accordance with the rules of the Patent Office and the patents or trade-mark registrations to which they are attached shall have the same force and effect as if such certificates had been specifically authorized by statute.

Patent Act of Mar. 4, 1925, ch. 535, 43 Stat. 1268–69 (1925) (current version at 35 U.S.C.A. § 254 (West Supp.2000)). The current version of § 254 is substantially similar to the 1925 statute.

tion] shall be attached to each printed copy of the patent, and such certificate shall be considered as part of the original patent." 35 U.S.C. § 254. It also provides that "[e]very such patent, together with such certificate, shall have the same effect and operation in law on the trial of actions *for causes thereafter arising* as if the same had been originally issued in such corrected form." *Id.* (emphasis added). We conclude that this language requires that, for causes arising after the PTO issues a certificate of correction, the certificate of correction is to be treated as part of the original patent—i.e., as if the certificate had been issued along with the original patent. By necessary implication, for causes arising before its issuance, the certificate of correction is not effective.

In order to adopt Southwest's reading of the statute, we would have to conclude that the words "thereafter arising" are used to refer to the date a patent issues rather than to the date a certificate of correction issues. In our view, there are two main problems with this construction of the statute. First, it does not represent the most natural reading of the statutory language. Put another way, it is not the construction of the statute to which one comes most naturally from the flow of the words and sentences that are used. *See Demko v. United States,* 216 F.3d 1049, 1053 (Fed. Cir.2000); *LSI Computer Sys., Inc. v. United States Int'l Trade Comm'n,* 832 F.2d 588, 590, 4 USPQ2d 1705, 1707 (Fed. Cir.1987) (" '[T]his court will not bend or strain the words of a statute to change its meaning unless there is a persuasive and clear showing that Congress did not intend for the letter of the statute to prevail.' " (quoting *Ocean Drilling & Exploration Co. v. United States,* 220 Ct.Cl. 395, 600 F.2d 1343, 1348 (1979))).

We reject Southwest's argument that the construction of § 254 that we have adopted fails to give effect to all parts of the statute. *See United States v. Nordic Village, Inc.,* 503 U.S. 30, 36, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992) (stating that it is a "settled rule that a statute must, if possible, be construed in such fashion that every word has some operative effect"). We do not believe that our construction of the statute in any way nullifies or renders surplusage the words "such certificate shall be considered part of the original patent." This language plays the role of establishing that, for all circumstances in which the certificate of correction is effective—namely, at all times after its issue date—the certificate is considered part of the original patent.

Second, the construction of the statute that is urged by Southwest could produce an illogical and unworkable result. *See Timex V.I., Inc. v. United States,* 157 F.3d 879, 886 (Fed.Cir.1998) (stating that a statute is to be construed so as to avoid an absurd result if at all possible). For example, a patent with a single claim in means-plus-function form [10] might, through a PTO mistake,[11] omit from the specification the structure, material, or acts corresponding to the function recited in the claim. Until the PTO issues a certificate of correction pursuant to 35 U.S.C. § 254 adding the corresponding structure, such a claim would appear invalid to the public, and reasonable competitors would be justified in conducting their affairs accordingly. In such a case, where the claim is invalid on its face without the certificate of correction, it strikes us as an illogical result to allow the patent holder, once the certificate of correction has issued, to sue an alleged infringer for activities that occurred before the issuance of the certifi-

---

**10.** Pursuant to 35 U.S.C. § 112, ¶ 6, "[a]n element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts de-

scribed in the specification and equivalents thereof."

**11.** This example assumes that the PTO mistake meets the requirements for issuance of a certificate of correction under 35 U.S.C. § 254.

cate of correction. Moreover, it does not seem to us to be asking too much to expect a patentee to check a patent when it is issued in order to determine whether it contains any errors that require the issuance of a certificate of correction. In this case, the omission of the Program Printout Appendix from the '257 patent resulted in the absence of approximately 330 pages of text from the specification. It would seem that such an error would be readily apparent.

Southwest directs our attention to *Eagle Iron Works v. McLanahan Corp.*, 429 F.2d 1375, 166 USPQ 225 (3d Cir.1970). It argues that the case supports its contention that, as properly construed, § 254 provides that the certificate of correction is effective for purposes of the lawsuit against Harlequin and ECRM. We disagree. We do not believe that *Eagle Iron Works* helps Southwest.

The statute at issue in *Eagle Iron Works* was 35 U.S.C. § 255, entitled "Certificate of correction of applicant's mistake." As in effect for purposes of *Eagle Iron Works*, that statute provided as follows:

> Whenever a mistake of a clerical or typographical nature, or of minor character, which was not the fault of the Patent Office, appears in a patent and a showing has been made that such mistake occurred in good faith, the Commissioner may, upon payment of the required fee, issue a certificate of correction, if the correction does not involve such changes in the patent as would constitute new matter or would require re-examination. Such patent, together with the certificate, shall have the same effect and operation in law on the trial of actions for causes thereafter arising as if the same had been originally issued in such corrected form.

35 U.S.C. § 255 (1970).

Section 255 contains language concerning "causes thereafter arising" that is nearly identical to that found in § 254. However, § 255 does not contain language similar to that found in § 254 stating that "[a] printed copy thereof shall be attached to each printed copy of the patent, and such certificate shall be considered as part of the original patent." 35 U.S.C. § 254.

In *Eagle Iron Works*, Eagle Iron Works ("Eagle") sued McLanahan Corporation ("McLanahan") for infringement of U.S. Patent No. 3,160,321 (the " '321 patent"). Prior to filing suit, Eagle applied to the PTO for a certificate of correction under 35 U.S.C. § 255 to correct a mistake that had resulted in the inclusion of the word "first" in two claims of the patent. After Eagle's suit was filed, the PTO issued the certificate of correction. *See Eagle Iron Works*, 429 F.2d at 1376 n. 1, 166 USPQ at 226 n. 1. In appealing from a judgment of infringement in the district court, McLanahan argued, among other things, that the certificate of correction enlarged the scope of the claims of the '321 patent and that, prior to the issuance of the certificate, its accused product did not infringe. *See id.* at 1383, 166 USPQ at 231. The Third Circuit affirmed the judgment of infringement. The court held that "[s]ince ... the Certificate of Correction did not change the scope of the patent and ... it was validly issued pursuant to the statute, [the alleged infringer's] contention that it achieved intervening rights ... must fall." *Id.* at 1387, 166 USPQ at 234.

*Eagle Iron Works* is not binding precedent on this court, however. *See Minnesota Mining & Mfg. Co. v. Norton Co.*, 929 F.2d 670, 672, 18 USPQ2d 1302, 1304 (Fed. Cir.1991) (stating that the Federal Circuit is "not bound by decisions rendered by other circuit ... courts" for matters within its exclusive subject matter jurisdiction); *see also South Corp. v. United States*, 690 F.2d 1368, 1370–71, 215 USPQ 657, 658 (Fed.Cir.1982) (en banc) (adopting only the jurisprudence of the Court of Claims and the Court of Customs and Patent Appeals because "no body of law established by any other court or set of courts would appear a suitable candidate for adoption."). In any event, we do not find *Eagle Iron Works* persuasive authority. Significantly, in *Ea-*

*gle Iron Works* the court did not explain how its holding with respect to the effectiveness of the certificate of correction was supported by the language of § 255. It simply stated: "The statute permits a minor error, when made in good faith, to be corrected. In effect, the correction is given retroactive application in order that intervening rights may not be alleged." *Id.* Indeed, the Third Circuit, in dicta, recently questioned its decision in *Eagle Iron Works,* stating: "We are not so confident in the broad ameliorative powers of the certificate of correction." *Carnegie Mellon Univ. v. Schwartz,* 105 F.3d 863, 867 (3d Cir.1997).

3. Southwest's cause of action against Harlequin and ECRM arose before the certificate of correction was issued. Because the certificate of correction is not effective for purposes of this action, the Program Printout Appendix cannot be considered part of the '257 patent for purposes of this action, because it was added to the patent by the certificate. We thus turn to Harlequin's and ECRM's contention that, without the Program Printout Appendix, claim 1 of the '257 patent is invalid because the patent's specification fails to satisfy the best mode and enablement requirements of 35 U.S.C. § 112, ¶ 1. As noted above, however, the district court did not address the issue of whether, without the Program Printout Appendix, the '257 patent satisfies the best mode and enablement requirements. The trial was conducted as if the certificate of correction were effective and the Program Printout Appendix were part of the patent. Therefore, because we hold that the certificate of correction is not effective for this lawsuit and consequently the Program Printout Appendix is not part of the patent for this lawsuit, we must remand for the district court to consider Harlequin's and ECRM's contention that claim 1 was invalid prior to April 1, 1997. Finally, we point out that, for any cause of action arising after April 1, 1997, the date the certificate of correction issued, the certificate will be treated as part of the original patent. Therefore any invalidity arising from the absence of the Program Printout Appendix only affects causes arising before the certificate issued. Put another way, if claim 1 is found to have been invalid without the Program Printout Appendix, the invalidity ceased on April 1, 1997, when the PTO issued the certificate of correction.

4. All that remains, as far as validity is concerned, are the arguments that claim 1 is invalid for obviousness and is invalid because, as far as the calibration of halftone input images is concerned, the '257 patent fails to meet the enablement, best mode, and written description requirements of 35 U.S.C. § 112, ¶ 1, the definiteness requirement of 35 U.S.C. § 112, ¶ 2, and the utility requirement of 35 U.S.C. § 101. Harlequin and ECRM did not raise these arguments in a motion for JMOL at the close of all evidence, so they could not renew them after the jury verdict in accordance with Fed. Rule Civ. P. 50. Therefore, they may not challenge the underlying facts relating to these issues; they may, however, challenge the judgment on the ground that the district court committed an error of law or abused its discretion. *See Young Dental,* 112 F.3d at 1141, 42 USPQ2d at 1592 ("Where a party fails to make a motion for JMOL at the close of the evidence, the sufficiency of the evidence underlying presumed jury findings cannot be challenged through a renewed motion for JMOL or on appeal.... Nonetheless, the party may challenge the judgment on the ground that the judge committed an error of law or abused his discretion, i.e., it may challenge the judge's legal conclusion on obviousness ... and any other issue that was the province of the court rather than the jury and to which it timely objected at trial.") (citing *Jurgens v. McKasy,* 927 F.2d 1552, 1557, 18 USPQ2d 1031, 1035–36 (Fed.Cir. 1991)). Here, the determination of nonobviousness contains no legal error or abuse of discretion. The district court "decline[d] to find for the defendants on the issue[ ] of obviousness ... by clear and convincing evidence and accept[ed] the ad-

visory verdict of the jury on [this] issue[ ]." We see no legal error in that conclusion. Also, we discern no error in the judgment that the '257 patent is not invalid for lack of enablement, failure to disclose best mode, indefiniteness, lack of an adequate written description, or lack of utility.

### III. Southwest's Cross–Appeal

*The Grant of JMOL with respect to Claim 11 of the '257 Patent and Claim 10 of the '443 Patent*

■ Southwest argues that the district court erred by failing to submit the issues of infringement of claim 11 of the '257 patent and claim 10 of the '443 patent to the jury, and, instead, entering JMOL of noninfringement of these claims. In particular, it asserts that, because a reasonable jury could find infringement based on a proper claim construction, it was improper to grant the motion for JMOL.

Southwest focuses its argument on the "mapping means" limitation of claims 10 and 11, both of which are apparatus claims. It does so because, in Harlequin's and ECRM's JMOL motion, they asserted that this means-plus-function limitation of claims 10 and 11 was not infringed. Thus, we understand the "mapping means" limitation to be the only limitation in claim 10 of the '443 patent and claim 11 of the '257 patent that is disputed by the parties. Southwest argues that we must construe the "mapping means" limitation in these claims, and that, under a proper construction of the limitation, the "mapping means" is the transfer function executing in the raster image processor for calibrating either positive or negative sense representations. Armed with this construction, Southwest argues that it presented sufficient evidence for a reasonable jury to find infringement. In particular, it points to testimony by James Burns, the named inventor on the '257 and '443 patents, that Harlequin's ScriptWorks Revisions 6 and 7 infringed both claim 11 of the '257 patent and claim 10 of the '443 patent. It also points to Harlequin's own manuals and testimony by Dr. David Earl, a senior software engineer for Harlequin.

Harlequin and ECRM respond that Southwest failed to present sufficient evidence of infringement of claim 11 of the '257 patent and claim 10 of the '443 patent. Specifically, they assert that Southwest presented no analysis of the structures in the accused Harlequin products that perform the claimed function of "mapping either positive or negative sense representations ... to be output as said calibrated output images on said image bearing media." '443 patent, claim 10. Also, Harlequin argues that Southwest did not dispute the meaning of "mapping means" at the *Markman* hearing. Therefore, the term should be given its plain meaning. According to Harlequin, the term "mapping means" should be construed to include only a device that calibrates both positive *and* negative images, not positive *or* negative images.

In sum, Harlequin and ECRM argue, Harlequin's products do not perform the function of the "mapping means" limitation of the claims; therefore, they do not infringe. Also, they argue that Southwest's failure to prove direct infringement by any third party negates any argument for contributory infringement, inducement of infringement, or infringement under 35 U.S.C. § 271(f).

The district court ruled from the bench when it granted Harlequin's motion for JMOL and did not provide any written opinion, so it is not entirely clear under what reasoning the court granted the motion. In addition, the court did not state at any time its construction of the disputed "mapping means" claim limitation. In short, the record does not reflect any claim construction or analysis by the district court as to the "mapping means" limitation. Under these circumstances, we are unable to review the decision of the court on this issue. *See Graco, Inc. v. Binks Mfg. Co.*, 60 F.3d 785, 791, 35 USPQ2d 1255, 1259 (Fed.Cir.1995). Accordingly, the judgment of the district court that

Harlequin and ECRM did not infringe claim 11 of the '257 patent and claim 10 of the '443 patent is vacated and the case is remanded for further proceedings on the infringement issue.

## CONCLUSION

*Harlequin's and ECRM's appeal*

The district court did not err in denying Harlequin's and ECRM's motion for JMOL that Harlequin's ScriptWorks Revision 6 did not infringe claim 1 of the '257 patent. However, we vacate the judgment in favor of Southwest that was based upon the jury's verdict that Harlequin and ECRM infringed claim 1 of the '257 patent through ScriptWorks Revision 6 and remand the case to the district court for further proceedings. We do so because the certificate of correction that added the Program Printout Appendix to the '257 patent is not effective for purposes of this lawsuit. On remand, the district court must determine whether, in the absence of the Program Printout Appendix, claim 1 of the '257 patent is invalid for purposes of this action because the specification of the '257 patent fails to satisfy the best mode and enablement requirements of 35 U.S.C. § 112, ¶ 1. However, this is the only validity issue that will be before the district court on remand in connection with claim 1; we have found no error in the district court's rejection of Harlequin's and ECRM's other challenges to the validity of claim 1 of the '257 patent. If the court determines that claim 1 is invalid for purposes of this action, then Harlequin and ECRM will be entitled to a judgment of noninfringement with respect to claim 1. If the court determines that the '257 patent is not invalid for purposes of this suit, then Southwest will be entitled to have the judgment of infringement of claim 1 and the resulting award of damages reinstated.

*Southwest's Cross-appeal*

The district court properly denied Southwest's request for a new trial on the issue of infringement of claim 1 of the '257 patent by ScriptWorks Revision 7. However, we vacate the court's grant of Harle-

quin's and ECRM's motion for JMOL that they did not infringe claim 11 of the '257 patent and claim 10 of the '443 patent and remand for further proceedings on those issues. In the case of claim 11 of the '257 patent, of course, the entry of a judgment of infringement will be subject to the determination of whether, for purposes of this lawsuit, the claim is invalid for the reasons asserted with respect to claim 1. There are no validity issues pending with respect to the '443 patent.

## VACATED AND REMANDED

## COSTS

Each party shall bear its own costs.